FILED & JUDGMENT ENTERED

Christine F. Winchester

July 26 2024

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **GLOBAL CARE** | ) | Case No. 23-30160 |
| **ADMINISTRATORS, INC.** | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| | ) | |
| **KEVIN SULLIVAN,** | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | Adversary Proceeding |
| v. | ) | No.  24-3028 |
| | ) | |
| **GLOBAL CARE** | ) | |
| **ADMINISTRATORS, INC.**  and | ) | |
| **C. TIMOTHY RODENBUSH,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

**THIS CASE** is before the Court on the following matters:

1.     Objection of Global Care Administrators, Inc. ("GCA" or "Debtor") to the Proof of

Claim filed by Kevin Sullivan ("Sullivan"). *Proof of Claim No. 2*, Case No. 23-30160 (July 20,

2023).

2.     The trial of Sullivan's prepetition state law action against GCA and C. Timothy Rodenbush ("Rodenbush") seeking damages pursuant to the North Carolina Wage and Hour Act, N.C. GEN. STAT. §§ 95-25.1, et seq. (the "NCWHA") and alternatively for breach of contract. *Kevin Sullivan v. Global Care Administrators, Inc. and C. Timothy Rodenbush*, North Carolina General Court of Justice, Superior Court Division, Mecklenburg County, Case No. 20-CVS-10528.  This case was removed to this Court and is now Adv. No. 24-03028 (the "Adversary Proceeding").

3.     The Bankruptcy Administrator's Motion to Dismiss the Chapter 11 Case.  Case No. 23-30160, Doc. 31 (July 5, 2023).

4.     GCA's Amended Motion for Authority to Sell Property Free and Clear.  Case No. 23-30160, Doc. 90 (Apr. 16, 2024).

5)     The Debtor's Proposed Chapter 11 Disclosure Statement.  Case No. 23-30160, Doc. 49 (Oct. 22, 2023).

Pursuant to a stipulation between the parties, it was agreed that GCA's objection to Sullivan's proof of claim and Sullivan's state court claims against GSA and Rodenbush arise under a common nexus of operative facts and should be tried together in this bankruptcy court, via bench trial.[1]  Case No. 23-30160, Doc. 94 (Apr. 17, 2024).  By further consent of the parties, the other aforementioned case matters were continued and will be recalendared.

The evidentiary hearing on the claim objection and the trial were conducted on April 30 through May 1, 2024, based on a consolidated record.  Sullivan was represented by Richard B. Fennell and John Burric of James, McElroy & Diehl, P.A.; Rodenbush by Sara R. Lincoln of

---

[1] To procedurally support disposition of the Sullivan claims against Rodenbush, the Parties filed an agreed notice of removal of the State Court Action to this Court.  This occurred on June 10, 2024 and thereafter the State Court action was denominated Adv. No. 24-3028.

Lincoln Derr PLLC and Michael Martinez of Grier Wright Martinez, PA; and the Debtor by John C. Woodman of Essex Richards.

## STATEMENT OF THE CASE

Sullivan, a former Chief Executive Officer ("CEO") of the Debtor, seeks actual and liquidated damages, costs and attorney's fees against his former employer on the contention that GCA failed to pay Sullivan his deferred salary in violation of the NCWHA.  These damages total approximately $185,000.  Alternatively, but under the same reasons, Sullivan alleges the Debtor breached his contract of employment.

Sullivan asserts the same claims against Rodenbush, an indirect shareholder and lender of GCA.  Sullivan maintains Rodenbush, who manages an entity referred to as 105 Canada, went beyond the scope of rights as the Debtor's largest lender and effectively controlled GCA.  Under this theory, Sullivan alleges that Rodenbush is an employer of Sullivan under the NCWHA and jointly liable with the Debtor to Sullivan for his damages.  As GCA is utterly insolvent, practically, Sullivan is looking to Rodenbush for recompense.

The Defendants reject Sullivan's claims.  They first argue that Sullivan was a "bona fide executive" of GCA.  At $50,000/year, they argue Sullivan was paid more than minimum wage and therefore Sullivan's claim fall outside the reach of the NCWHA.

The Defendants further deny any agreement to pay Sullivan the $150,000 salary he claims, much less to annually defer $100,000.00 of that sum.  The Debtors admit that on October 15, 2019, GCA deferred payment of executive salaries because the Debtor was in dire financial straits and 105 Canada was unwilling to advance further monies without a stipulation that the loan proceeds would not fund executive salaries.  However, such deferral was agreed to by the affected executives (including Sullivan), who were both principals and equity holders of the

Debtor.  Further, it was then agreed that executive compensation could resume whenever GCA generated revenues or obtained other investment monies with which to pay these salaries. However, no such funds were ever generated, GCA failed and later went into bankruptcy.  Given the failure of the condition, the Debtor claims there was no breach of the deferral agreement.

For Rodenbush's part, he denies being or acting as Sullivan's employer.  He claims he had no control over GCA, Sullivan, its operations, or the payment of Sullivan's salary.  As to the breach of contract count, Rodenbush argues that he was not party to any contract with Sullivan and cannot be liable for any alleged breach.

Finally, and to the extent that any deferred salary is owing to Sullivan, the Debtor suggests that either the salary should be recharacterized as equity under applicable Fourth Circuit precedent, or else treated as excessive compensation and deemed constructively fraudulent.

Having heard the evidence presented as well as the arguments of counsel, this Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The Debtor was formed in 2017 as a Delaware corporation.  Over its brief, three-year lifespan, GCA operated from an office located in Mecklenburg County, North Carolina.  GCA was a small startup firm which, at its peak, had but 6-7 employees.  The majority of employees were principals of the concern who directly or indirectly held stock in the Debtor.

GCA was envisioned by its founders to develop and then market a "healthcare intelligence platform," i.e., software for use in healthcare administration ("the Software Platform").  The Software Platform was intended to revolutionize the processing and reporting of data related to healthcare costs, claims, and analytics, enabling hospitals and healthcare providers to capture small billings.

GCA was founded by Mark Bodner ("Bodner"), Isaac Montanya ("Montanya") and Scott Guilfoyle ("Guilfoyle"). Bodner originally conceived the software and was the creative force behind the Debtor. As Sullivan put it, Bodner was the "mad scientist" who made GCA possible. Bodner originally held the title of CEO and Chief Innovation Officer. Guilfoyle was also a tech expert who worked for CGA, chaired the Debtor's Board of Directors, and served as President of the Debtor's subsidiary, Global Care Analytics ("Analytics"). Montanya appears to have served as Vice President and Secretary of GCA and perhaps as its Chief Marketing Officer.[2]

In recognition of the startup's limited financial resources and as a part of their contribution to the enterprise (ie., "sweat equity"), Bodner, Guilfoyle, Montanya, and later Sullivan (the "Charlotte Principals") worked for modest salaries.[3] If the business proved as successful, their upside lay in the equity interests that each held in GCA.

GCA operated under the supervision of a Board of Directors ("the Board"). Bodner and Guilfoyle comprised the original Board. Later, the Board was expanded such that it usually had five to seven members, with each board member having equal voting power. In time, Sullivan and Rodenbush would be appointed to the Board.

**GCA's Initial Finances.**

From the beginning, GCA was undercapitalized, financially stressed, and almost certainly insolvent.

As envisioned by its founders, CGA had a three-step funding plan: Step 1: obtain seed investors to get the company moving, Step 2: obtain "Series A" capital investment, meaning outside investment of greater amount, and Step 3: obtain "Series B" investment, a second round

---

[2] *See Defendant's Trial Exhibit 39*, p. 28, ¶¶ 30 & 33; *Montanya et.al. v. Global Care Administrators, et.al.*, 18-CVS-20318. This exhibit was not admitted at trial, but judicial notice is taken of the Answer and Counterclaim filed in that state court action. In short, this is what GCA and Sullivan then alleged. The truth of their statement is not material to the present dispute.
[3] For example, as of 2018, Bodner was making only $50,000 per year.

of outside investment or an infusion of venture capital.[4]   The hope was that by the point the
Software platform would be finished, and the company would attain profitability.   Although not
directly stated at trial, the parties' contemporaneous communications reveal a shared belief that
GCA might possibly be sold or other investors brought in, permitting the principals to realize
large profits on their equity interests.

### Sullivan is Recruited by GCA.

In early 2018, Sullivan was recruited by Bodner to join GCA.   Sullivan was sought out
due to his extensive prior experience in the healthcare industry.   Such expertise was particularly
needed because GCA was already experiencing operational and revenue problems.   Initially,
Sullivan declined employment due time constraints arising from his existing business interests.
However, Sullivan did agree to come on board in March of 2018 as a consultant and a board
member.

### 105 Canada and Rodenbush Become Involved with GCA.

Rodenbush is a retired businessman and a resident of Canada.   105 Canada is an
investment company indirectly owned by a Rodenbush family trust and operated by Rodenbush.
In early 2018, Rodenbush was seeking investment opportunities having recently sold a business.
Rodenbush's attorney introduced him to Montanya, who was seeking funding sources for GCA.
The two men met at Rodenbush's home in Vancouver.   After hearing Montanya's pitch,
Rodenbush was interested in GCA.

Further discussions gave shape to the original 105 Canada loan and investment.   On
March 14, 2018, 105 Canada and GCA entered into a "GCA Convertible Loan Agreement"
("Loan Agreement").   Under the Loan Agreement, 105 Canada initially advanced the sum of
$300,000 to GCA.   It was agreed that if the Debtor achieved certain performance milestones,

---

[4] *See* Scott Guilfoyle's email to Rodenbush dated June 30, 2018.

6

additional sums could be advanced to it, up to a cap of $1.5 million.  These milestones included reporting requirements by the Debtor to 105 Canada relating to the former's financial performance, sales activities, etc.

Reflecting the financial realities of a startup business without a marketable product, and the fact that that Bodner and Montanya were both GCA employees and principals in the business, the Loan Agreement contained a pay cap: the salaries of Bodner (CEO) and Montanya (the Vice President) could not exceed $10,000 per month each ($120,000 annually).

Thus, the Rodenbush transaction was structured as debt, with 105 Canada originally acting as lender to GCA.[5]  However, 105 Canada also acquired a 6% equity interest in GCA. The Loan Agreement provided that 105 Canada could convert its loans to equity in the future, at the price of $1,500 per share.

**Sullivan's Role with GCA Expands.**

On June 21, 2018, Sullivan signed an employment agreement to become GCA's President and Chief Operating Officer ("Employment Agreement") ("COO").  Technically, the Employment Agreement was signed by Bodner, not GCA.  However, this appears but a scrivener's error.[6]  Clearly, Sullivan was hired by GCA to work on a part-time basis under Bodner, its then CEO.  Rodenbush was not involved in the Sullivan hire.  He learned of it when it was later announced by Bodner.

The Employment Agreement stipulates that COO Sullivan would be paid a salary of $50,000 for his first year of work and that his compensation would be renegotiated in subsequent years.  However, Sullivan maintains this was not his full compensation: he says he had a side

---

[5] It appears that the Charlotte Principals (Bodner, Montanya, Guilfoyle, and later Sullivan) viewed 105 Canada as a "Series A" capital investor.
[6] An almost identical agreement employing Guilfoyle as President of Analytics, the Debtor's subsidiary, at a $50,000 per year salary also treats Bodner as the employer.  Both were thereafter treated as employees of the two companies, not of Bodner.

deal with Bodner/GCA. His real salary was $150,000 per year, with $50,000 paid and $100,000 deferred. That deferral, Sullivan contends, was required by Rodenbush given GCA's financial struggles.[7] As detailed below, the alleged $150,000 salary and deferred compensation lie at the core of the present dispute.

**Sullivan Manages GCA.**

Technically Bodner remained CEO of GCA until March of 2019, when Sullivan replaced him. However, this was a small business where titles and actual duties did not always coincide. A review of the texts and emails between the parties reflects that even as COO, Sullivan was openly and actively operating GCA.

In GCA's case, "operations" largely translated to attempting to (1) develop the Software Platform and (2) to raise additional funds by which to develop that software. Because GCA had little operating revenue, GCA's expenses were primarily funded by investment dollars and loans, most provided by 105 Canada.

As COO, Sullivan's day-to-day control of GCA is reflected in the fact that shortly after he was hired, he retained a new Certified Public Accountant for the company. By his own testimony, in his first months on the job, Sullivan sought to understand why the Company was spending $140,000 a month but producing little revenue from its existing hospital clients for whom it provided "key management insights" via its existing software. He says he quickly realized that GCA had one dominant customer who was not paying its bills. The hospital in question owed GCA $571,000.

After that review, Sullivan began changing GCA's business model and customer base. He hired a new Chief Technology officer. While GCA was a small business with limited

---

[7] As discussed in further detail, the evidence does not show any such deferment agreement with Rodenbush making any such promises.

operations, and one in which all of the principals (including Rodenbush) had a say, in terms of the day-to-day operations, Sullivan was clearly GCA's "shot caller."

**Montanya litigation.**

On May 14, 2018, Montanya was terminated from his employment with GCA. Sullivan testified that he urged Bodner to terminate Montanya because he "found that Montanya was not doing anything," only "collecting a bunch of money and living off of the money that was coming into the company" while producing nothing of value. Sullivan further testified that Montanya was using company money for personal expenses.

After his termination, Montanya filed a lawsuit against the Debtor and several of the company principals, including Sullivan. The lawsuit was eventually settled.

**The Restructuring Agreement.**

By early Summer of 2018, GCA desperately needed a further cash infusion from 105 Canada. This quickly put Sullivan at odds with Rodenbush, given the 105 Canada was neither receiving the required financial reporting from GCA nor its interest payments on its then-outstanding debt.

These tensions increased when Rodenbush learned of a plan by Sullivan and GCA's other Charlotte Principals to restructure GCA and place its software in a separate legal entity. Such an action would potentially dilute 105 Canada's equity interest in GCA and place its loans at risk.

Given all, 105 Canada/Rodenbush balked at providing further advances to GCA. In a running email conversation with Sullivan and Guilfoyle, between June 29 and July 5, 2018, Rodenbush suggested that if GCA required further funds, Bodner and Sullivan should consider investing their own money.

That suggestion did not sit well with Sullivan. In a June 29, 2018 reply to Rodenbush, he declared the lending relationship to be "off the rails." Sullivan arrogantly informed Rodenbush

that they were not "equals in this relationship," referring to their respective roles in GCA. Rodenbush was simply there to provide operational funds to GCA. By contrast, Sullivan and the other Charlotte Principals were providing their expertise to grow this startup business and providing services to its customers. In short, Rodenbush was but a lender; whereas Sullivan, Guilfoyle, et.al, were running the business.

A contemporaneous email from Guilfoyle to Rodenbush reflects the same perspective. Ruling out making the requested personal investment in GCA, Guilfoyle tells Rodenbush that "my investment would be all my time at extremely low arbitrary compensation to see what we could create." And finally, in a follow-up email to Rodenbush sent July 2, 2018, Sullivan reiterates Guilfoyle's view of what their contribution to GCA was to be: their time and expertise.

The extrinsic evidence confirms the Charlotte Principals' mindset and that GCA was operated by them, not Rodenbush. Rodenbush had never been to the Debtor's offices, nor would he ever. Unlike the Charlotte Principals, Rodenbush was never employed by GCA. And unlike themselves, he was not one of its officers. Apart from the many communications with the Charlotte Principals, Rodenbush did not participate in the day-to-day operations of the company.

Given the mindset, and the company's finances, it is unsurprising that these conversations did not lead to accord. On November 16, 2018, 105 Canada declared a default under the Loan Agreement. GCA responded by threatening to close its doors. Such a closing, of course, would mean the loss of 105 Canada's investments in the Debtor.

Eventually, this dispute was consensually resolved through a reorganization (the "Reorganization"). The Reorganization was multifaceted, but essentially, 105 Canada converted its outstanding debt to equity as memorialized in the Loan Agreement and Shareholder's Agreement of January 26, 2019. As a result, 105 Canada became GCA's largest shareholder, but

not a majority shareholder.  Beginning in October of 2019, 105 Canada held just under 20.6% of

GCA's outstanding shares, whereas the Charlotte Principals held between them 42.44% (Bodner

18.44%; Sullivan 12%; Guilfoyle 12%).

Sullivan replaced Bodner as CEO and became a fulltime employee of GCA.  No written

employment agreement memorializes Sullivan's change in status or stipulates his salary terms.

This omission is important given that the parties had agreed in the Amended Shareholders

Agreement that going forward, all compensation paid to senior management (CEO, President,

V.P) would require the unanimous consent of the Board.  There were no Board records submitted

at trial that show approval of Sullivan's compensation.

Finally, as a part of the deal, Rodenbush was elected to the GCA Board.  Thus, as of

March 9, 2019, the Board consisted of Bodner, Montanya,[8] Mike Cushing, Guilfoyle, Sullivan

and Rodenbush.  As one of six directors, Rodenbush did not control the Board.  In fact,

Rodenbush abstained from board votes which may have been perceived as self-serving to 105

Canada.  However, after Rodenbush became a board member, he and Sullivan regularly

corresponded about GCA matters, particularly regarding its persistent financial needs.

The Reorganization only temporarily alleviated the Debtor's financial problems.  With

few other revenues and no new investors,[9] GCA remained dependent upon cash infusions from

105 Canada.  In February of 2019, 105 Canada had injected another $500,000 in GCA.

However, by early April of 2019, Sullivan was again informing Rodenbush the company would

need more funds in order to continue operating for another 60-90 days.  On this occasion,

Rodenbush again suggests that the Charlotte Principals share with him in the burden of funding

GCA.  Ultimately, they did not.  105 Canada advanced another $450,000 to GCA under a Note

---

[8] Apparently, Montanya remained on the Board after his termination.
[9] Rodenbush testified that the other principals, including Sullivan, were unwilling to invest additional monies in the Debtor.

dated April 18, 2019 to avoid a shutdown.

Reflecting GCA's dire financial situation, in a "State of the Union" email dated April 24, 2019, Sullivan apprises the Principals and others that [they]'ve "cut expenses to bare minimum until we generate some revenue and or raise some additional capital."  However, Sullivan passed on potentially good news, as well: efforts were underway to raise another $4 million from "Series B" (meaning, outside) investors.  In this, Sullivan was referring to Merge, an outside entity, whom GCA hoped would invest in the company.

Five months later—in October of 2019—this had not happened.  There was still hope that Merge would provide $4 million in funding in exchange for a 10% equity stake in GCA.  With this, all concerned (including Rodenbush) believed that the Debtor would be able to complete the Software Platform and to go operational.  However, with GCA still experiencing severe financial difficulties, a "bridge loan" would be needed to tide it over until the Merge deal closed.

To this end, on November 15, 2019, Sullivan emailed Rodenbush about GCA's need for $90,000 to cover that month's expenses.  Rodenbush replied that he would not have further investment monies available until the first of December.  Given that, Rodenbush asked Sullivan whether the senior executives might defer payment of their own salaries until other monies (other revenues or third-party investment dollars) were secured.  Rodenbush couched this as a suggestion: "I don't want that to be the focus or perceived as it being acting unreasonably."

Hearing this, Sullivan commented to the Corporate Secretary, "[Rodenbush] sounds nervous."  But to Rodenbush, Sullivan responded that the company's payroll was due on November 30, so a delay in making the bridge loan might be a problem.  Sullivan ignored the suggestion to defer salary.  However, this time, Rodenbush did not budge from his condition.

Sullivan cites the loan condition as evidence that Rodenbush controlled GCA, within the

12

meaning of the Wage and Hour Act.  However, given that those involved were GCA principals holding equity interests in GCA, the condition is better understood as Rodenbush saying to his peers, "If I'm going to put more skin in this game, you should too."

In the end, Sullivan and company agreed to Rodenbush's condition for the bridge loan with each hoping that the Merge deal would soon close[10] and provide GCA with sufficient capital to finally complete the Software Platform and to pay them.

Ultimately, it was the Debtor's and the executives' choice whether to accept the loan condition.  Even then, they were free to pay executive compensation out of other company funds—whether through other investments or via revenues generated by GCA.  Alternatively, the executives could simply defer their compensation until the Merge deal closed and be repaid afterwards.

This conversation reflects that all parties viewed GCA as an investment venture: one with a big financial upside <u>if</u> the software platform was completed and proved marketable. Rodenbush's role was primarily providing money; Sullivan et. al. were to continue contributing their expertise and labor at reduced salary levels.  Hoping for a big payday, each was willing to invest more, but held a careful eye to what the other Principals were providing.  In Rodenbush's case, he kept an eye on what the others were taking out in salary.

With that agreement in mind, 105 Canada made the bridge loan.  Accordingly, after October 15, 2019, GCA stopped paying executive salary.

Unfortunately, the Merge investment did not close.  Sullivan blames this on Rodenbush, but that accusation appears to be short-sighted and unfair.  At the November 14, 2019 Board meeting, Sullivan reported Merge was now interested in investing a total of $8 million in CGA

---

[10] Sullivan's request for a bridge loan that only covered November expenses reflects a shared belief that the Merge closing would occur before December.

($2 million upfront, and $6 million later).  In return, it wanted a 20% equity position in the company.  This was problematic: GCA had only 15% of its equity available for purchase. Sullivan proposed to make 25% of GCA's equity available for sale, by creating two classes of stock.  However, Rodenbush was rightfully concerned that Sullivan's proposal would dilute 105 Canada's position in GCA.  A further difficulty lay in the fact that Merge had not yet raised its $6 million follow-on investment.

Since it could not acquire 20% of the GCA stock by the December 2019 board meeting, Merge pulled back; wanting to change its investment from $8 million to a total of $1.4 million. Ultimately, the Merge investment deal did not close.

A second investor had been found and then rejected by the GCA Board when it appeared that the potential investor might be engaged in illegal money laundering activity.  By January 15, 2020, GCA was all out of investor prospects.  Once again, the Debtor was forced to ask 105 Canada/Rodenbush for another $90,000 to "keep the doors open."  Lacking any other option, 105 Canada continued to fund GCA.

**The Bodner Negotiation.**

As the Fall of 2019 passed with no outside investment and without a marketable Software Platform, the Charlotte Principals began to regret their agreement to defer salaries.  By mid-January 2020, Bodner was threatening to leave GCA and to report the company to the Labor Department.  Legalities aside, without Bodner—the creator of the Software Platform—there was no GCA and no way for 105 Canada to recoup the monies it had already loaned to/invested in GCA.

Rodenbush spoke with Bodner about the prospect of personally retaining Bodner to work as a consultant in hopes of keeping him at GCA.  To that end, Rodenbush waived the October 15, 2019 pay prohibition so that GCA could pay Bodner a portion of his deferred salary.  Then,

in early March of 2020, Rodenbush personally agreed to pay Bodner both his back pay and continue paying him going forward on the condition that Bodner remain with GCA for two more years.

As a part of this agreement, Bodner surrendered his stock to GCA[11] in exchange for a share of GCA's "zero base collections" net profits—the revenue base that, under Sullivan, GCA had moved away from.  Over time, Rodenbush would personally pay Bodner $15,000-30,000 of his deferred compensation.

Sullivan claims he was not involved in these negotiations and the deal was struck negotiated between Bodner and Rodenbush.  According to Sullivan, because he was CEO, his absence from the negotiations shows improper control of GCA by Rodenbush.  Factually, this testimony appears only partially correct.  The negotiations were between Rodenbush and Bodner and the salary payments to Bodner were to be funded by Rodenbush, although they were to flow through GCA.

On the other hand—as noted below—at the start of these negotiations, Sullivan had announced his own (deferred) resignation from GCA, so Rodenbush stepping into the negotiation cannot be seen as usurping Sullivan's authority.  Nor was Sullivan excluded from these conversations; contemporaneous emails about the Bodner proposal included Bodner, Rodenbush, Sullivan, company counsel and other Charlotte Principals.  Sullivan's own email references to the Bodner proposals reflects an understanding on his part of what was being discussed and done.  Sullivan was not cut out from the negotiations; the Bodner proposal was approved by GCA and the departing Sullivan simply declined to sign the written agreement.

---

[11] Thus, benefitting all shareholders to their interests.

**Sullivan Announces his own Resignation.**

In October 2019, Sullivan agreed to defer his pay pending the Merge closing or other monies becoming available.  When that closing didn't happen, Sullivan chaffed at the deal he had made.  Thus, on January 14, 2020, Sullivan sent the Board a letter stating that he intended to resign, effective 90 days hence.  Sullivan says he "was sick of not getting paid . . . ."  Further, it appears he believed and resented that Rodenbush, and not he, controlled the company.

While couched as a resignation letter, a fair reading of the document suggests Sullivan did not really want to resign.  He was attempting to use the threat of his leaving GCA to coerce it (or more realistically, Rodenbush) to pay him.

**The Goldsmith Investigation.**

Sometime in late 2019, Rodenbush learned from Bodner that Sullivan had caused the Debtor to abandon its "zero balance" collection system and its focus on hospital clients.  This was GCA's only pre-existing source of revenues.  Between this discovery, and GCA's failure to attract outside investments, Rodenbush feared the Debtor was about to fail.  Then, he received Sullivan's resignation letter.

In response, Rodenbush hired George Goldsmith[12] ("Goldsmith") a friend, mentor, and fellow Canadian businessman, to investigate the Debtor's operations and prospects.  Rodenbush wanted Goldsmith's recommendation of whether 105 Canada should invest any further monies in GCA and under what terms.  Specifically, how much further investment would be required to enable GCA to finally complete the Software Platform?

In late February of 2020, Goldsmith traveled to Charlotte where he met with Sullivan and several other company employees.  Sullivan makes much of the Goldsmith visit, asserting improper control by Rodenbush (through Goldsmith) over GCA's affairs.  However, the purpose

---

[12] Goldsmith is occasionally and mistakenly referred to as George Rosmir within Plaintiff and Defendant Exhibits.

of Goldsmith's visit was made clear before[13] and during his visit: he was there to investigate GCA's operations, not direct them.  Goldsmith made it quite clear to all that he was acting on behalf of 105 Canada, not GCA.

In a lunch meeting with Goldsmith—which Sullivan himself recorded and was introduced into evidence—Sullivan impressed upon Goldsmith that he, Sullivan, was running GCA and not Rodenbush.  Sullivan then detailed his own importance to the venture.  It appears Sullivan was attempting to persuade Goldsmith that GCA needed him to survive.

**Sullivan leaves GCA.**

Neither the Board or Rodenbush were inclined towards Sullivan's payment and control demands, and so on March 15, 2021, Sullivan left GCA.  The next day, April 1, 2020, Sullivan demanded payment of his deferred compensation from the Debtor.  On August 5, 2020, Sullivan sued GCA and Rodenbush.

**GCA Struggles on.**

GCA struggled on for a time with Goldsmith pressed into service as interim CEO.  But in November 2021, once again out of money and still with no marketable software product, GCA shut its doors.  The company lay inert until at a special shareholder's meeting held on December 10, 2021, when the shareholders decided to liquidate the company.  Local accountant Michael Bowers was designated Chief Restructuring Officer.  Seeking the most economical way to wind up the company's affairs and simultaneously deal with Sullivan's pending legal action, GCA filed Chapter 11 on March 3, 2023 (the "Petition Date").

**Sullivan's Demands.**

In his State Court Complaint, Sullivan asserted that at the time of his departure from GCA, he was owed $227,083 in unpaid wages.  Recently, Sullivan filed an unsecured proof of

---

[13] In his February 15, 2020 email to Goldsmith about this visit, Sullivan acknowledges that Goldsmith was to be acting on behalf of Rodenbush, not GCA.

claim against the Debtor's bankruptcy estate for $455,166.00—the $227,083.00 of alleged wages, doubled per the NCWHA.  Sullivan also seeks interest and attorney's fees.

Defendants denied liability, and the action proceeded in State Court to the point of trial. The Debtor's bankruptcy filing upset the trial setting and stayed the matter as to GCA.

## ISSUES PRESENTED

To decide this case, we must answer the following questions:

1.     What was Sullivan's agreed salary?

2.     Was there an agreement between Sullivan and the Defendants to defer a portion of his salary?

3.     If so, what amount of deferred compensation was owed to Sullivan as of April 1, 2020?

### Issues Pertaining to Count 1- The NCWHA Claim

4.     Was Sullivan an executive employee of GCA within the meaning of the Act?

5.     Was Rodenbush also Sullivan's "employer," as that term is defined in N.C. Gen. Stat § 95-25.2(5)?

### Issues Pertaining to Count 2- The Breach of Contract Claim

6.     Did GCA and/or Rodenbush breach any contract with Sullivan regarding his deferred compensation?

### If Sullivan succeeds on either or both Counts,

7.     What amount of damages, if any, is Sullivan entitled to recover from GCA and/or Rodenbush?

8.     Is Sullivan entitled to recover his costs and reasonable attorneys' fees?

9.     If any amount is owed to Kevin Sullivan by GCA, should it be recharacterized for bankruptcy distribution purposes as equity under applicable Fourth Circuit precedent?

### DISCUSSION

Subject matter jurisdiction lies under 28 U.S.C. § 1334(b).  Reference of these matters to this Bankruptcy Court occurred under the General Order of Reference entered by the United States District Court for the Western District of North Carolina on July 30, 1984.

Sullivan's state law claims against GCA and its objection to Sullivan's proof of claim are "core matters."  Sullivan's claims against Rodenbush are "related to" the bankruptcy within the meaning of 28 U.S.C. §§ 157 and 1334.  Through stipulation and removal of the State Court action, Sullivan and Rodenbush have consented to a final adjudication of their dispute in bankruptcy court, subject only to appeal under 28 U.S.C. § 158.

### I.      Sullivan's Salary and Deferred Salary (Issues 1-3).

According to Sullivan, when he was hired as COO in June of 2018, he and Bodner agreed that Sullivan's actual pay would be $150,000 per year.  Of that sum, $100,000 would be deferred until the company obtained outside funding or until Sullivan demanded payment.  Sullivan maintains that he is owed deferred salary from June 2018 through March 15, 2020.

Sullivan seeks to prove these salary claims by reference to putative GCA accounting ledgers.  He further testified that the Board had an agenda line item to review executive compensation at its meetings where such records were reviewed.

Sullivan seeks to further back up his assertions by reference to an October 15, 2019 text conversation between himself, Rodenbush, and Guilfoyle concerning the "bridge loan."  Here, Rodenbush makes it a precondition to the bridge loan that none of 105 Canada's advance be used to pay executive compensation.  Guilfoyle responds by remarking that he and Sullivan have been deferring their salaries for well over a year.  Guilfoyle does not quantify the amounts, and the statement is not discussed or contradicted by Rodenbush or Sullivan.

By contrast, the Defendants admitted in their State Court Answer that Sullivan "had a salary of $120,000 per year," but denied any salary deferral, save for that arising out of the October 15, 2019 bridge loan—when Sullivan and the other senior executives agreed to defer their pay until other monies became available.

Overlooking their judicial admission, GCA now suggests that Sullivan is owed no monies whatsoever: (1) because his contract was with Bodner, not the Debtor, and (2) because the terms of the October 15, 2019 salary deferral have not been met—GCA never obtained any further outside capital or revenue. However, should this Court find otherwise, both Defendants maintain Sullivan's salary was but $50,000 per year and his pay was only deferred for five months (October 2019 to March 2020). The maximum amount he could be owed by the Debtor is $20,833.33.

Obviously, the evidentiary record concerning Sullivan's pay and deferral is both incomplete and conflicting. Approaching this muddle in reverse order, we start with the fact that both Defendants admitted in their Answer Sullivan was to be paid $120,000 per year.

Just before the scheduled State Court trial, Defendants unsuccessfully attempted to amend their Answer to deny that Sullivan had an agreement with GCA for a salary of either amount, $120,00 or $150,000. Rather, Sullivan's salary was that found in the Employment Agreement, $50,000 per year. The Defendants argued to the State Judge that they gave an incorrect initial response in their Answer. This supposedly was because they lacked access to the books and records of GCA. The State Court did not find their argument convincing, and the motion was denied.

Again, before this Court, the Defendants argue for at most, a $50,000 salary figure. However, they fail to explain why GCA supposedly lacked this basic information about its CEO

and his pay when their Answer was filed.  Nor do they explain why this Court should disturb the State Judge's ruling.  This Court is inclined to enforce the judicial admission against the Defendants: at a minimum, Sullivan had an annual salary of $120,000.

Since the Defendants have judicially admitted the $120,000 per year compensation, we really need not consider their ancillary arguments.  However, but for the sake of a complete record,[14] we will touch on them in passing.

As to the Debtor's suggestion that because Sullivan' Employment Agreement was signed by Bodner, GCA has no liability to Sullivan, we simply do not agree.  As noted, the fact that Bodner and not GCA is named in the Employment Agreement appears to be a harmless scrivener's error.[15]  The parties' subsequent conduct makes clear Sullivan was hired by GCA in July 2018 to work under Bodner, its CEO at the time.  CGA promoted Sullivan to CEO in January of 2019 and there he remained until his resignation on March 31, 2020.

GCA's second contention—that Sullivan is not owed any compensation because the conditions of payment were never fulfilled—also falls on fallow ground.  Sullivan worked for the Debtor.  He earned his compensation, at some rate, from services performed from October 2019 to March of 2020.  Payment for those services was simply deferred.  The liability was not contingent upon GCA acquiring more funds.  And given that GCA is in bankruptcy and will never obtain those funds, Sullivan is clearly owed a debt by the Debtor's estate.

That said, Sullivan has failed to meet his burden of proof to establish a salary of more than the judicially admitted $120,000 rate or that any salary was deferred prior to October. 15, 2019.

First, and most importantly, the only written agreement pertaining to Sullivan's

---

[14] The undersigned is retiring.  Hopefully, addressing the contentions now would avoid the need for a retrial or a lengthy review of the evidence by my successor, should the judicial admission conclusion be rejected on appeal.
[15] *See supra* note 6.

employment with GCA is the Employment Agreement, dated June 21, 2018. This agreement was signed when Sullivan was hired as COO. It stipulates a salary of only $50,000 for Sullivan's first year of work. It makes no mention of any deferred salary.[16]

As plaintiff and a bankruptcy creditor, Sullivan has the ultimate burden of proof to demonstrate any right to salary above the $120,00 amount as well as the existence of an agreement to defer much of that pay (prior to the acknowledged deferral period of October 15, 2019 to March 31, 2020).

While Sullivan says he had a side deal to pay him another $100,000 deferred, this is rather unlikely. Sullivan does not explain why he, an experienced businessman, would sign a written agreement promising to pay him only $50,000, if the parties' actual agreement was for $150,000. Nor does he explain why, if the majority of his pay was to be deferred, that understanding was not reduced to writing when the immediately payable $50,000 per year was. After all, according to Sullivan, both deals were reached contemporaneously when he was hired as COO.

Second, GCA's Articles/bylaws required that all officer compensation be approved by the GCA Board. No evidence of any such approval was presented at trial. Even by his own parole account, Sullivan acknowledges that his (alleged) side deal was reached with Bodner alone. It does not appear that the Board ever approved the additional pay or any deferral.

Third, barely three months before the Employment Agreement, GCA and 105 Canada stipulated in their Loan Agreement that the compensation for key employees (Bodner, GCA's then-CEO, and Montanya, its putative Vice President) could not exceed $120,000 annually, each.

---

[16] One might normally assume that in March 2019, when Sullivan became CEO and went from parttime to fulltime work, he would have received a pay bump. However, not even Sullivan suggests that this was the case. This and several other factors reflect that GCA was a venture undertaken by relative equals, and not the typical employee-employer relationship where the employee is not an owner. The potential upside for all concerned was not in their wages, but in realizing on their equity interests, should the software and the Debtor prove successful.

Why, then, would GCA immediately turn around and agree to pay Sullivan—who worked under Bodner—more than Bodner could be paid?  Similarly, given GCA's dire financial condition and its dependence on loans provided by 105 Canada, why would the Debtor risk breaching the Loan Agreement by paying Sullivan more than the stipulated maximum for executive compensation? There is no indication that the Board ever approved a deferral, nor 105 Canada.

As to the Excel spreadsheets Sullivan presented to bolster his claims, these documents are undated and unverified by any other member of GCA.  At best, they would have been prepared by management working under Sullivan.  They may have been kept this way so Rodenbush wouldn't know about them, as this violated the Loan Agreement.

As to the parties' contemporaneous communications, even if the October 15, 2019 text vaguely supports Sullivan's contentions, other texts contradict them.  For example, as of July 3, 2018, Sullivan and Rodenbush were at odds about financing the company and who should bear the cost.  In a communication between them, Rodenbush is asked by Sullivan to defer interest on 105 Canada's loans.  Rodenbush counters saying that if interest is to be deferred, it would be contingent upon Sullivan and Guilfoyle "deferring their $50k annual salaries" until the interest was caught up.  An obviously offended Sullivan replies with a diatribe, which includes a statement that "the $50k does not impact either of our lives" and that "neither of us "enjoy" sweat equity."  Sullivan does not say his compensation was actually $150,000; nor does he mention that he is deferring two thirds of that salary.  Given the context, one would expect him to do so unless the Charlotte Principals were intentionally breaching the Loan Agreement by paying too high salaries and simply didn't want to tell Rodenbush.

Again, in the May 2019 text exchanges between Sullivan and Rodenbush, we see Rodenbush floating the idea of executives deferring their salaries "until there's some sight of

some cash." Sullivan rejects his proposal out of hand, referencing the (large) number of hours he was presently working at GCA. Had Sullivan been deferring two thirds of his salary, one could reasonably expect him to say so at this moment. However, Sullivan makes no mention about this, suggesting that no salary was being deferred at the time.

On this record, the only deferred compensation agreement between Sullivan and GCA appears to be the one arising out of the October 15, 2019 discussions in which 105 Canada/Rodenbush conditioned further lending to GCA on these monies not being used to fund executive pay. GCA and the affected executives, including Sullivan, then agreed to the condition. And from this point forward until early March 2020,[17] all agree, Sullivan was not to be paid by GCA.

## II.     Sullivan's Alleged Deferred Compensation Claims under the NCWH (Issues 4 & 5).

A deferred compensation agreement is one where the employer will pay compensation to employees at a future date and is predominantly used to defer the payment of taxes. *In re IT Group, Inc*., 448 F.3d 661, 664 (3d Cir. 2006).

Under the NCWHA, an employer who fails to pay its employees' wages is liable to the effected employee for the unpaid wages or wages owed under NCWHA plus 8% interest as of the date each amount came due. N.C. GEN. STAT. § 95-25.22(a). An employer who satisfactorily shows that the act or omission of failing to pay the employee wages was in good faith may be excused from paying the liquidated damages. N.C. GEN. STAT. § 95-25.22(b).

Given the similarities between the NC Wage and Hour Act and the Federal Fair Labor Standards Act, state courts often turn to case authorities decided under the federal law to

---

[17] Sullivan was paid a small amount, $15,000 as part of his departure.

determine cases brought under NCWHA.[18]

> **A.** **Being a Bona Fide Executive of the Debtor within the meaning of the NCWHA, Sullivan is unable to avail himself of its protections.**

The minimum wage provisions of the NCWHA are explicitly inapplicable to bona fide executives as defined under the FLSA. N.C. GEN. STAT. § 95-25.14(b)(4).

The Fourth Circuit, adopting the Department of Labor's definition, defines a "bona fide executive" as "one who earns at least $455 per week, has authority over hiring and firing, routinely supervises at least two other employees, and—most relevant here—whose "primary duty is management of the enterprise in which the employee is employed."" *Morrison v. County of Fairfax, VA*, 826 F.3d 758, 762 (4th Cir. 2016) (quoting 29 C.F.R. § 541.100).

Even at his lowest possible salary ($50,000), Sullivan's annual salary equates to $962 per week, exceeding the monetary threshold to be considered a bona fide executive. *Rodenbush's Pretrial Memorandum*, Doc. 100, p. 6. At $120,000 per year, Sullivan was making approximately $2,300 per week, or five times the threshold.

As to the ability to hire and fire employees, Sullivan testified about his bringing in a CPA shortly after he was retained to work for GCA. Similarly, in Sullivan's April 24, 2019 State of the Union email he informs the GCA group that he plans on hiring a contract manager in the near future. Finally, Sullivan reports having fired an employee named "Patricia," although he credits a Mark Cushing as having "actually pulled the trigger." Both acts demonstrate Sullivan's power to hire and fire GCA employees.

As to management, the GCA's Bylaws give the President "general and active

---

[18] The NCWHA is modeled after the Fair Labor Standards Act, and both utilize the same definition of "employer." *Compare* N.C. GEN. STAT. § 95-25.2(5); *and* 29 U.S.C. § 203(d). As such, North Carolina courts rely on the FLSA and cases interpreting it for guidance. *E.g.*, *Powell v. P2Enterprises, LLC*, 247 N.C. App. 731, 733-34, 786 S.E.2d 798, 800 (2016); *Beckley v. Priority Auto. Grp., Inc*, No. 3:21-cv-00072-RJC-DSC, 2022 U.S. Dist. LEXIS 55741, at *13 (W.D.N.C. Mar. 28, 2022) (Conrad, J.).

management of the business of the corporation" and "general power and duties of supervision and management as defined by the Board of Directors," indicating management of the enterprise.

As Sullivan made quite clear first to Rodenbush in his June 28, 2018 text and later to Goldsmith in their February 29, 2020 meeting at the restaurant, Sullivan ran GCA. His "primary duty [was] management of the enterprise . . . ."

In short, the Defendants have amply demonstrated that Sullivan was a "bona fide executive" under the *Morrison* definition. As such, he falls outside of the NCWHA and is unable to avail himself of its protections. Count 1 of the Complaint fails against both Defendants, without more.

### B.   While GCA was undisputably Sullivan's Employer within the Meaning of the NCWHA, Rodenbush was not.

All agree that GCA was Sullivan's employer within the meaning of the NCWHA. If Sullivan fell within the protected class of employees under the Act (which he does not), GCA would potentially be liable to him for his unpaid wages. However, GCA is hopelessly insolvent and is unlikely to return any meaningful dividend to general unsecured creditors.[19] Thus, the real thrust of Sullivan's NCWHA claim is against Rodenbush who Sullivan also claims to be his "employer," and thus liable to him for his unpaid wages and other damages.

Even if the NCWHA were applicable to Sullivan, it would not deem Rodenbush his "employer." Under the NCWHA, an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." N.C. GEN. STAT. § 95-25.2(5); 29 U.S.C. § 203(d).

Employers may be subject to individual liability for unpaid wages. *Powell v.*

---

[19] Administrative expenses in the case totaled over $10,000 before the costs of this trial. Additionally, the IRS has filed a priority wage claim of $14,300.35. Both would have to be paid before any dividend was paid to the $456,866 of general unsecured claims filed in the case. Meanwhile, the proposed sale of the Debtor's only asset, the software, is for the sum of $50,000.

*P2Enterprises*, 247 N.C. App. 731, 734, 786 S.E.2d 798 (N.C. App. 2016).   Intended to be

construed broadly, the North Carolina courts both local and federal apply an "economic reality"

test.   N.C. GEN. STAT. § 95-25.25; *Powell v. P2Enterprises, LLC.*, 247 N.C. App. at 735.

> [The economic realities test looks to] the totality of the circumstances to
> determine whether the individual has sufficient operational control over the
> workers in question and the allegedly violative actions to be held liable for unpaid
> wages or other damages. Factors commonly relied on by courts in determining
> the extent of an individual's operational control over employees include whether
> the individual: (1) had the power to hire and fire employees; (2) supervised and
> controlled employee work schedules or conditions of employment; (3) determined
> the rate and method of payment; and (4) maintained employment records.

*Id*. (citations and quotations omitted). None of these factors are exclusive or dispositive.

Rather it is the consideration of all circumstances that is most determinative. *Id*.

Based on the aforementioned factors, the evidence confirms that Rodenbush was not in

fact Sullivan's "employer."

1.   <u>Rodenbush did not maintain GCA's employment records (Factor 4).</u>

Starting with the most obvious evidentiary factor, it is undisputed that Rodenbush was

neither an employee nor an officer of GCA. Rodenbush never even visited the GCA offices, and

he never maintained any employment records belonging to the Debtor. Factor 4 is absent.

2.   <u>The evidence does support Sullivan's contention that Rodenbush had the
power to hire and fire employees (Factor 1).</u>

Sullivan testified that Rodenbush's involvement with the Debtor went beyond that of a

financier. This much is true. In time, Rodenbush became not just GCA's lender, but a member

of its board of directors and, indirectly, its largest shareholder.

As to factor 1, Sullivan asserts that Rodenbush was "actively involved in decisions to

hire/fire employees of [the Debtor]." He points to the Company's decision to fire Montanya in

May of 2018, the hiring of Gary Basra ("Basra") in December of 2019, and the hiring of

Goldsmith in 2020.

These assertions are not factually well-founded.  Sullivan first suggested that Rodenbush "pressured" Sullivan to fire Montanya.  However, during the February 29, 2020 restaurant meeting with Goldsmith, Sullivan states that he himself instructed Bodner to fire Montanya and then contradicts himself saying it was ultimately Bodner's decision to terminate Montanya.  Either way, Rodenbush was not the decisionmaker.

Meanwhile, the decision to rehire Basra was done through a vote of the board of directors.  Rodenbush was but one of several directors, so he obviously did not control that decision.  Further, concurrent emails exchanged between the group show that it was Sullivan who encouraged the Board to make the Basra hire.

As to Goldsmith, he was only hired by GCA after Sullivan left the company.  For our NCWHA purposes, the relevant time period is when Sullivan was still employed by GCA but not being paid: mid-October 2019 through mid-March 2020.  Goldsmith was not managing the Debtor at this time nor was Rodenbush, acting through Goldsmith.

3.   Rodenbush neither supervised CGA's employees; nor did he control their work schedules or the conditions of their employment (Factor 2).

Being neither an employee nor an officer of GCA, Rodenbush did not supervise employees.  He did not control their work schedules, nor did he control the conditions of the employees' employment.  Rodenbush never maintained any employment records belonging to the Debtor, and he never had access to GCA's accounting system.  Finally, Rodenbush never had access to the Debtor's accounts, nor did he have check signing authority.

Nevertheless, Sullivan accuses Rodenbush of controlling and supervising at least one employee: himself.  To this end, Sullivan cites his numerous conversations with Rodenbush about GCA matters.  At trial, Sullivan presented a number of emails and text messages between himself and Rodenbush showing that, between June 2019 through January 2020, the two parties

communicated on a weekly basis about the business.

Unfortunately, these messages will not carry the evidentiary weight that Sullivan would assign to them.  Certainly, there were numerous "conversations" between Sullivan, Rodenbush, the other GCA principals, and even corporate council.  Most of these conversations are but short texts or emails spread out over a period of days, if not weeks.  Many of these texts relate to GCA's ever present need for funding and the conditions under which Rodenbush (via 105 Canada) was willing to provide.  The conversations between Rodenbush and Sullivan et.al. reflect, at most, a <u>lender's</u> "power of the purse" over its borrower.  The conversations do not show an <u>employer's</u> control over an employee, as contemplated by the NCWHA.

Other texts are related to business and operations, but even so, they do not show Rodenbush instructing Sullivan what to do or how to manage GCA.  As one would expect, these conversations actually reflect the principals of a small startup company—Bodner, Sullivan, Guilfoyle and Rodenbush—discussing its affairs.  The conversations occurring after March 9, 2019, took place after Rodenbush was a board member and 105 Canada was a substantial shareholder of GCA, further legitimizing the interaction.  This was not even the case of a major bank lender telling its corporate borrower how to run its business.  These conversations do not translate Rodenbush exercising control and supervision over Sullivan or any other employee.

Hoping to demonstrate that control, Sullivan suggests Rodenbush "dictated how GCA should oversee salespeople and track sales statistics."  Here, Sullivan is referencing those texts and email conversations from April 2018 where Rodenbush suggests that GCA create/modify a reporting metric for use by the Debtor's salespeople.

Rodenbush acknowledges that he was actively involved with the creation and development of this reporting metric.  However, to provide context, one thing should be noted.

At this early point, 105 Canada was primarily a lender to GCA.  Under the Loan Agreement, it was entitled to receive financial reporting from GCA, which GCA was not providing. Rodenbush made several requests for financial information, including information regarding GCA's sales leads.  This is information important to 105 Canada because it would aid in assessing GCA's compliance with the Loan Agreement milestones.  There is nothing domineering or improper about a lender asking for information which it is entitled under a bargained-for loan agreement.

Although such sales contact information is commonly tracked by companies, GCA apparently did not have this ability.  Rodenbush was familiar with such tracking systems from his other business ventures.  So, when Bodner emailed existing company reporting figures to Rodenbush, the latter pointed out deficiencies in GCA's reporting and made suggestions about how that reporting could be improved.  Again, this suggestion was neither domineering nor sinister.  Rather, it reflected a reality known to all small corporations: the company principals contribute their personal business knowledge to the business.  Rodenbush's suggestion to Sullivan how the Debtor could obtain and provide the sales contact information does not in any way prove Rodenbush was running the company or acting as Sullivan's employer.

Sullivan next suggests Rodenbush had unilateral control over the Board, giving him "total control over the conditions of employment of GCA's employees."  However, at trial, Sullivan offered no explanation of Rodenbush's ability to control the Board apart from the obvious influence of a lender "controlling the purse."

Moreover, there is contrary evidence to show that Rodenbush, while an indirect lender and a board member, was neither controlling the Board nor supervising employee's work conditions and schedules.  For example, Rodenbush testified that he disclosed and abstained

from voting in any board matters which were self-serving or had the appearance.  And as to the suggestion that Rodenbush was running GCA, Sullivan again contradicts himself.   In his recorded conversation with Goldsmith, Sullivan emphasizes that he (Sullivan) is "engaging in running the company" and "does everything for [the] company" including resisting the pressures of other board members to settle the Montanya lawsuit.

Although Rodenbush was involved in the Debtor's business, that involvement does not rise to the level of control and supervision of the Debtor's employee schedules and work conditions.  This factor is also absent.

    4.    <u>Rodenbush did not directly determine the rate and method of payment (Factor 3).</u>

There is no evidence suggesting that Rodenbush determined the rate of individual employees pay, or the method by which employees would be paid.  The most that can be said is that through 105 Canada's agreements with GCA, it had the ability to influence what the executives could be paid.  As to this, the 2018 Convertible Loan Agreement included specific provisions concerning the maximum compensation and deferral of compensation to Bodner and Montanya.   Later, Rodenbush made the bridge loan contingent upon none of 105 Canada's advance going to fund executive compensation.  However, neither reflects an employer's control of an employee's compensation; rather, it reflects a lender's stipulations as to the terms and conditions under which it is willing to lend to the company.  And that, in the final analysis, is the nubbin of Sullivan's contentions against Rodenbush.  Essentially, because GCA had no other source of funding but 105 Canada, Sullivan views Rodenbush as personally in charge of everything at GCA, and thus his "employer" under the NCWHA.

We do not agree with Sullivan's characterizations.   From a neutral third party's perspective, GCA was a start-up business with several principals.  Each brought something

different to the table: Bodner, the software idea; Guilfoyle, the tech experience; and Sullivan, the healthcare management expertise.  As Sullivan laid it out to Rodenbush, early on Sullivan, Bodner, and Guilfoyle were the principals of the business.  They viewed Rodenbush was the money man who would provide GCA with its initial funding.  Although 105 Canada was also a shareholder, the Charlotte Principals viewed Rodenbush/105 Canada as an outside lender, not a member of management with an equal say over the Debtor's affairs.[20]

The relationship changed somewhat after the Restructuring Agreement.  105 Canada became the Debtor's largest shareholder (although it still held a minority interest overall as compared to the Charlotte Principals) and Rodenbush, a director.

But the things that caused GCA to fail (and Sullivan to not be paid) were occasioned by failures of the other principals.  Bodner was not able to bring the software to completion.  Under Sullivan's management, other capital/revenues were not obtained, and Sullivan took the company away from the hospital auditing business which at least—in theory—could have produced some revenue.  The outside "Series B" capital investments from outside entities did not come to fruition, and GCA was unable to find funding elsewhere.  All the while, GCA teetered on the brink of collapse.  None of this was Rodenbush's fault, but it forced 105 Canada to continue to lend to GCA, lest all of its prior loans/investments be lost.

In recognition of this, and given that 105 Canada's loans were being spent by GCA in significant part to pay salaries to the Charlotte Principals, Rodenbush began placing conditions on further lending.  After months of unsuccessfully suggesting that the other principals contribute money to the cause, Rodenbush makes the "bridge loan" on condition that 105 Canada's money not be used to pay their executive salaries.

---

[20] And yet, no one has suggested that the Charlotte Principals should be treated as "employers" liable for unpaid wages.

On these facts, it would be inappropriate to deem Rodenbush Sullivan's "employer."  In point of fact, there are no North Carolina cases decided under the NCWHA holding that the lender to a distressed company is an "employer" of the latter's employees.  This, even though the NCWHA has existed for more than 50 years.  It would greatly distort the reality of the parties' relationships to now hold that Rodenbush was the "employer" of the others when he wasn't running the business and wasn't technically even its lender.

From a public policy perspective, it would appear undesirable to deem a lender, even a shareholder lender, an "employer" under the NCWHA simply because it lends to a distressed company.  If a shareholder becomes an "employer" and liable for all of the company's unpaid wage claims simply because it made an advance to a floundering company, no reasonable shareholder would ever lend.  This would make the company even more likely to fail.  Similarly, if the lender who makes one advance and imposes conditions upon further advances is deemed an "employer" liable for the wages of all company employees, no rational person would ever lend.  This is undesirable because both start-up businesses and financially distressed businesses are frequently dependent upon such shareholder loans.

Finally, it would be most unfair to deem Rodenbush Sullivan's "employer" and personally liable for large amounts deferred compensation when the evidence suggests he knew nothing about these arrangements.  It appears that Sullivan never told Rodenbush about the arrangements or GCA's breach of the contract until after the fact.

Assessing the factors in totality, Rodenbush's involvement in GCA and his indirect investments and lending to GCA do not make him personally Sullivan's "employer."  Thus, even if Sullivan was not a bona fide executive, he still could not recover from Rodenbush, under the NCWHA.

### III.    Breach of Contract (Issue 6).

The existence of a claim is controlled by state law.  *Canal Corp v. Finnman (In re Johnson)*, 960 F.2d 396, 404 (4th Cir. 1992).  "Under North Carolina law, to establish a claim for breach of contract, a plaintiff must show "(1) existence of a valid contract and (2) breach of the terms of that contract."  *Rector v. Nirvana Extractions, LLC.*, 2023 WL 4875882 at *6 (M.D.N.C. 2024) (quoting *Montessori Children's House of Durham v. Blizzard*, 244 N.C. App. 633, 781 S.E.2d 511 (N.C. Ct. App. 2016)).

Contracts in writing "are to be construed and enforced according to their terms." *Galloway v. Snell*, 384 N.C. 285, 287, 885 S.E.2d 834 (N.C. 2023) (quoting *Gould Morris Elec. Co. v. Atl. Fire Ins. Co.*, 229 N.C. 518, 520, 50 S.E.2d 295 (1948)).  "When the language of a contract is clear and unambiguous, effect must be given to its terms, and its terms may not be contradicted by parol[e] or extrinsic evidence."  *Galloway v. Snell*, 384 N.C. at 287 (internal citations omitted).  "An ambiguity can exist when, even though words themselves appear clear, the specific facts of the case create more than one reasonable interpretation of the contractual provisions."  *Galloway*, 384 N.C. at 287 (quoting *Register v. White*, 358 N.C. 691, 695, 599 S.E.2d 549 (2004)).  When an ambiguity exists, parole evidence may be introduced to clarify the meaning of the contract, not contradict its terms.  *Galloway*, 384 N.C. at 287 (quoting *Root v. Allstate Ins. Co.*, 272 N.C. 580, 590, 158 S.E.2d 829 (1968)).

### A.    The Debtor did not breach any contract or agreement, either with GCA or Sullivan.

We have previously concluded by judicial admission that Sullivan was to be paid $120,000 per year, and that prior to October 2019 none of his salary was deferred.  At best, Sullivan had a side deal with Bodner, but it was not reduced to writing, not approved by the Board, and not disclosed to 105 Canada who, undoubtedly, would have seen it as a breach of the

Loan Agreement and the amended Shareholders agreement.

Sullivan's employment agreement, such as it was, was modified by himself and GCA in October 2019, after 105 Canada conditioned the bridge loan upon it not being used to pay executive salaries. At that point, the Charlotte Principals—including Sullivan and GCA—agreed that the executives would not be paid their salaries until other monies became available to the company. That is the only salary deferment agreement Sullivan had with anyone.

Unfortunately, GCA never received any such funding, and the payment term was never triggered. Without the condition precedent, the Debtor has not breached a contract with Sullivan because on the date of his departure from GCA the payment obligation was not yet triggered.

**B.      Rodenbush has no contract with Sullivan and cannot be not liable for breach.**

Rodenbush is neither an employer of Sullivan nor a party to any employment agreement with Sullivan. He cannot be held liable for breach of contract for a contract to which he was not a party. Accordingly, Sullivan cannot recover from Rodenbush under this cause of action. Count Two fails as to both Defendants.

## IV.    Nevertheless, with GCA in Bankruptcy, Sullivan is Entitled to an Unsecured Claim for his unpaid wages.

Although Sullivan is not entitled in the adversary proceeding to recover damages against the Defendants under either cause of action, the fact remains that Sullivan worked for GCA from mid-October of 2019 until his March 15, 2020 departure. All agree he was not paid for his labor, although this did not breach a prepetition agreement, since payment was deferred until revenues were produced or investments were made.

However, GCA is now defunct and in Chapter 7 bankruptcy. There will never be any further revenues or investments made. That being so, equity would dictate that Sullivan have an allowed general unsecured claim for his deferred salary, lest the Estate receive a windfall for the

services he rendered.  *See e.g.*, *In re Reed*, 624 B.R. 155, 175 (Bankr. E.D.V.A. 2020) (creditor recovered "the reasonable value of the services provided" via quantum meruit and was allowed an unsecured claim in that amount).

Thus, employing the $10,000 per month rate judicially admitted by Defendants ($120,000/year), we conclude that Sullivan is owed $35,000 by GCA at the date of bankruptcy ($10,000 x 5 months=$50,000-15,000= $35,000).

**V.     The Debtor's Recharacterization/Constructive Fraudulent Transfer assertions fail.**

Finally, the Debtor suggests in its claim objection that any claim by Sullivan against it should be recharacterized as equity, not debt, under *Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*  453 F.3d 225 (4th Cir. 2006). Further, in its Trial Brief, the Debtor suggests that Sullivan's compensation would be constructively fraudulent under 11 U.S.C. § 548 as interpreted by this Court in *Ballantyne Brands v. Wiesehan, Jr. Ballantyne Brands.*  656 B.R. 117, 140 (Bankr. W.D.N.C. 2023) ("If the guaranteed compensation was excessive, then the other payments were for no consideration.").

Taking these in reverse order, the Debtor's fraudulent transfer assertion was not raised in the State Court action/Adversary Proceeding, nor in the Debtor's Objection to Sullivan's proof of claim.  Rather, it was raised only in the Debtor's trial brief.  A case may not be tried on "an unpleaded theory of recovery" without "express or implied consent of the parties." *Pinkley, Inc. v. City of Frederick, Md.*, 191 F.3d 394, 401 (4th Cir. 1999); *McLeod v. Stevens*, 617 F.2d 1038, 1040 (4th Cir. 1980).  No such consent has been given.  Rather, this appears to be a "throw in" argument, and even if this were not so, the action doesn't lie.  A constructive fraudulent transfer suit seeks to recover monies which were paid out by the Debtor before bankruptcy.  *See* 11 U.S.C. § 548(a)(2).  Here, we are fighting over monies which Sullivan was <u>not</u> paid.  There was

no transfer, and this is not a constructive fraudulent transfer case.

As to the Debtor's recharacterization attempt under *Dornier Aviation*, it is true that under limited circumstances a bankruptcy court may look beyond the titles used by the parties to recharacterize debts asserted against a bankruptcy debtor's estate as equity. *In re Dornier Aviation*, 453 F.3d at 233.

The Fourth Circuit utilizes eleven factors in such inquiries, including: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advance were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *Dornier Aviation*, 453 F.3d at 233 (quoting *AutoStyle Plastics*, 269 F.3d 726, 749-50 (6th Cir. 2001)).

"None of these factors is dispositive and their significance may vary depending upon the circumstances.'" *Dornier Aviation*, 453 F.3d at 234 (quoting *Sender v. Bronze Group, Ltd. (In re Hedged-Invs. Assocs., Inc.)*, 380 F.3d 1292, 1298-99 (10th Cir. 2004)). The analysis truly turns on the objective facts around the intention surrounding the debt. *See generally Roth Steel & Tube Co. v. Commissioner of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986).

The Debtor suggests that Sullivan's wage claim should be construed as equity, arguing that: (i) Sullivan had no written employment agreement (for the $150,000 salary with $100,000 deferred), (ii) the Debtor lacked the necessary resources to satisfy his compensation, (iii) the

Debtor was undercapitalized and regularly required to seek funds from 105 Canada to meet its expenses, (iv) the Debtor was unable to secure outside financing, and (v) the primary goal of Sullivan's services as GCA's CEO was to take the Debtor's software and platform to market in hopes that it become profitable and be acquired, making the principals wealthy.

In short, the Debtor suggests that the Company's officers, including Sullivan, should not have been receiving compensation at all from the Debtor; rather their labor should have been treated as sweat equity. We do not agree with GCA's position.

Certainly, Sullivan was one of the principals of this startup company and his company Chaotic Holdings, LLC, was a shareholder of GCA. Sullivan, Guilfoyle, and Bodner all agreed to work for GCA at a very low rate of compensation. As Sullivan points out, this was "sweat equity," and part of their contribution to the venture. As noted, all concerned, including Sullivan, thought GCA was on the verge of creating a new, cutting-edge Software Platform that would be widely used by hospitals and other healthcare businesses. Each saw a great deal of upside in the appreciation of their equity interests, <u>if</u> the Software Platform was achieved and GCA attained profitability or was otherwise sold to a third party.

However, as to the portion of Sullivan's $120,000 per year salary that was deferred from October 15, 2019 through March 15, 2020, this is a bridge too far. The Debtor seems to be analogizing to our decision in *Ballantyne Brand*s and contending that as there, Sullivan's pay was excessive. The *Ballantyne Brands* ruling was made based upon extensive expert testimony showing that the salary paid to Wiesehan, Jr., Ballantyne Brands' CEO, was excessive compared to executives in like businesses, both locally and nationally. *Ballantyne Brands*, 656 B.R. 117, 137-38. That evidence is lacking in this case, and it cannot be imported by analogy from another action. Moreover, *Ballantyne Brands* starts from the premise that employee compensation is

presumed to be for reasonably equivalent value, until the trustee shows otherwise.  *Id*. at 139.

Again, we have no such evidence.

Finally, if GCA's ultimate contention is that the principals of a startup company should

work for free, we are unaware of any law so stating.  The Debtor's recharacterization request

fails.

**CONCLUSION**

In conclusion, Sullivan's salary from GCA was $120,000 per year.  It appears he was

paid this sum until October 15, 2019, when he voluntarily agreed to defer payment of his salary

until GCA obtained monies other than the 105 Canada bridge loan.  Regrettably, no such funds

were ever realized, and Sullivan was not paid.  He was thus owed $35,000 by GCA at the filing

date.

Meanwhile, while GCA was clearly Sullivan's employer, as defined under N.C. GEN.

STAT. § 95-25.2(5), Sullivan was a "bona fide executive" of the Debtor, meaning the NCWHA

is inapplicable to his claims.  Even if this were not true, Rodenbush was not Sullivan's

"employer," as defined under N.C. GEN. STAT. § 95-25.2(5) and has no responsibility for any

unpaid compensation owing by GCA to Sullivan.  Therefore, **COUNT 1** of the Complaint is

**DISMISSED WITH PREJUDICE**.

Based on its judicial admission, GCA agreed to pay Sullivan $120,000 per year.  Sullivan

has failed to prove any additional compensation or deferral of salary, with one exception.  In

October 2019, and in hopes of bringing a mezzanine investor in and thereby bringing the GCA

software to market, Sullivan and GCA modified their Employment Agreement.  Sullivan agreed

to entirely defer his salary until GCA secured monies other than the 105 Canada bridge loan.

Because the funds never materialized, GCA ended up in bankruptcy.  Thus, while GCA owes

39

Sullivan $35,000 in compensation (given that it was deferred but not waived), it did not breach

any agreement regarding the payment of those sums.  Further, Rodenbush was not a party to any

contract with Sullivan and cannot be held liable for any breach.

Accordingly, **as against Rodenbush, COUNT 2** of the Complaint, is **DISMISSED**

**WITH PREJUDICE**.  **As against GCA and its bankruptcy estate**, however, **Sullivan is**

**ALLOWED a general unsecured claim of $35,000,** not for breach of contract, but rather

sounding in quantum meruit and in recognition of his labor.

The Debtor's unpled **Constructive Fraudulent Transfer assertion** is **DENIED** as is its

R**equest for Recharacterization** of Sullivan's claim from debt to equity.

Judgment will issue accordingly.


**SO ORDERED.**


**This Order has been signed electronically.**                     **United States Bankruptcy Court**
**The Judge's signature and Court's seal**
**appear at the top of the Order.**